**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **SHEILA J. O'CONNOR,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 12 C 2082** |
| | ) | |
| **CAROLYN W. COLVIN, Acting** | ) | **Magistrate Judge Finnegan** |
| **Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Sheila J. O'Connor seeks to overturn the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act. 42 U.S.C. §§ 416, 423(d), 1381a. The parties consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and filed cross-motions for summary judgment. After careful review of the record, the Court now denies Plaintiff's motion, grants the Commissioner's motion, and affirms the decision to deny benefits.

## PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on March 26, 2008, alleging that she became disabled on August 13, 2007 due to a "[l]eft femur fracture which caused

---

[1]     Ms. Colvin became Acting Commissioner of Social Security on February 14, 2013, and is substituted in as Defendant pursuant to Federal Rule of Civil Procedure 25(d)(1).

lower back misalignment and additional back surgery needed," and degenerative osteoarthritis in the spine and knees. (R. 185, 190, 226). The Social Security Administration denied the applications initially on May 23, 2008, and again upon reconsideration on November 13, 2008. (R. 85-88, 92-96, 100-02, 105). Plaintiff filed a timely request for hearing and appeared before Administrative Law Judge Sherry Thompson (the "ALJ") on February 19, 2010. (R. 37). The ALJ heard testimony from Plaintiff, who was represented by counsel, as well as from Plaintiff's adult daughter, Shanice Brown, and vocational expert Thomas A. Grzesik (the "VE"). Shortly thereafter, on October 20, 2010, the ALJ found that Plaintiff is not disabled because there are a significant number of light jobs she can perform. (R. 19-29). The Appeals Council denied Plaintiff's request for review on September 13, 2011, (R. 1-3), and Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

In support of her request for remand, Plaintiff argues that the ALJ: (1) failed to properly accommodate her moderate limitation in concentration, persistence or pace; (2) erred in weighing the opinion of her treating physician; (3) made a flawed credibility assessment; (4) improperly discounted her stated need to lie down during the day; (5) failed to properly consider the testimony of her daughter; and (5) wrongly ignored the fact that she was found disabled by another government agency. As discussed below, the Court finds that the ALJ's decision is supported by substantial evidence and there is no basis for a remand in this case.

## FACTUAL BACKGROUND

Plaintiff was born on January 29, 1966, and was 44 years old at the time of the ALJ's decision. (R. 40, 222). She has a high school diploma and spent 23 years working as a case processor/tax examiner for the IRS. (R. 41, 227).

### A.     Medical History

Plaintiff has a history of back pain dating to March 2000. In January 2002, she had a surgical laminectomy that enabled her to continue working for the next 5 1/2 years. (R. 737). A knee fracture in June 2007, however, caused her back problems to resurface.

####     1.     2007

On June 25, 2007, Plaintiff went to her primary care physician, Rita D. Woods, M.D., complaining of constant, throbbing left knee pain lasting 4 or 5 days. Dr. Woods observed effusion (fluid build-up) in the knee at that time. (R. 411). Four days later, on June 29, 2007, Plaintiff had a radiograph and ultrasound of her left knee at St. James Hospital. The tests were unremarkable, showing the knee to be "[n]ormal." (R. 352-54, 445-46). An MRI taken on July 20, 2007, however, revealed a lateral posterior femoral condylar fracture with bone edema, as well as degenerative changes of the posterior and medial menisci. (R. 447).

Plaintiff stopped working on August 13, 2007, and one week later, on August 20, 2007, she started treating with orthopedic surgeon William K. Payne, M.D., of Well Group Health Partners. Dr. Payne indicated that Plaintiff was likely suffering from a stress fracture and put her in a range of motion brace to stabilize

the knee. (R. 640). At a follow-up visit on August 30, 2007, Dr. Payne referred Plaintiff for physical therapy ("PT") to help with range of motion, strength and ambulation. (R. 466). Three radiographs of the left knee taken on October 9, 2007 revealed no evidence of a fracture, dislocation or significant "bony abnormality." (R. 644). By November 1, 2007, Plaintiff reported a 90-95% improvement in her knee pain and exhibited increased functional abilities. (R. 383). Dr. Payne confirmed that Plaintiff was "doing well" on November 6, 2007, though she still displayed some tenderness. (R. 634). An MRI taken the next day showed "[d]ecreased bone edema" compared to the July 29, 2007 test, which was deemed "a favorable change suggesting some interval healing." (R. 453, 503, 608). When Plaintiff returned to Dr. Payne later that month on November 29, 2007, however, she still had some pain and difficulty with her knee, as well as mild effusion and tenderness. Dr. Payne gave her a cortisone shot and referred her for more PT.[2] (R. 632).

At an appointment with Dr. Woods the next day, Plaintiff reported that she had been suffering from severe back pain for the previous week. Dr. Woods's treatment notes are difficult to read, but it appears that Plaintiff was in obvious physical distress at that time. (R. 401, 575). Plaintiff was still complaining of back pain when she returned to Dr. Woods on December 10, 2007, and was walking with an antalgic gait. Dr. Woods noted that Plaintiff was unable to obtain relief from her pain medication and muscle relaxers, and exhibited radiculopathy

---

[2]     As discussed *infra*, Plaintiff did not obtain approval for additional knee PT until March 2008.

(nerve root impingement). The doctor prescribed Norco, Vicodin and Motrin, and referred Plaintiff for PT. (R. 402, 576, 577). A radiogram of the lumbar spine taken on December 12, 2007, showed "[s]tatus post laminectomy changes L5-S1 vertebral body level," and "mild diffuse osteopenia." (R. 371-72, 455).

### 2. January through April 2008

On January 2, 2008, physical therapist Jake Darragh, MPT, conducted an initial evaluation of Plaintiff's low back pain, noting that it was "secondary to gait deviations associated with" the knee fracture. Mr. Darragh indicated that Plaintiff would benefit from various therapies and strength exercises to increase endurance and postural awareness, and decrease pain. (R. 387-90). Plaintiff completed six PT sessions over the next few weeks, but was still complaining to Mr. Darragh of persistent back pain as of January 21, 2008. (R. 392). In the meantime, Plaintiff told Dr. Payne on January 17, 2008 that her knee pain occasionally reached a level of 8 out of 10 even though she was taking Vicodin and Flexeril for her back. Dr. Payne instructed her to continue with her medication while she waited for approval for more PT on her knee. (R. 395, 630). On January 24, 2008, Plaintiff called Dr. Woods's office complaining that the Norco and Motrin were not controlling her pain. (R. 407). At an office visit six days later, Plaintiff's lower back pain was at a level of 8 out of 10 and Dr. Woods observed that she was in obvious pain and crying. (R. 403).

Plaintiff's back pain became so bad that on January 31, 2008, she was admitted to St. James Hospital in obvious physical distress. (R. 505, 507). Patrick Sweeney, M.D., was called in for a consultation the next day and he

ordered an MRI of the lumbar spine to determine whether there was any herniation at L4-L5. (R. 508). Plaintiff's February 1, 2008 MRI showed postoperative changes at L5-S1, including discogenic endplate changes, disc space narrowing and disc desiccation (dryness). The test confirmed, however, that there was no significant disc bulge, herniation, central canal stenosis or neural foramen narrowing. (R. 346, 456, 458). Plaintiff was discharged from the hospital on February 2, 2008 with prescriptions for Flexeril and a Medrol Dose Pack. (R. 506).

When Plaintiff returned to Dr. Woods on February 6, 2008, her pain was at a level of 5 out of 10 and she was doing much better than the previous week. (R. 406). The knee pain persisted, however, and on February 14, 2008, Dr. Payne sent her for x-rays while she continued to wait for approval for more PT. (R. 440). The same day, Plaintiff saw Dr. Sweeney for a follow-up examination at the offices of Minimally Invasive Spine Specialists, S.C. She reported that ongoing back pain was interfering with her sleep even though she was taking Flexeril, ibuprofen, and the Medrol Dose Pack. Dr. Sweeney responded by referring her for a bone scan. (R. 514). Plaintiff had the test on February 20, 2008, and was diagnosed with "[f]ocal tracer accumulation . . . involving L5-S1 region most likely due to active degenerative osteoarthritis." (R. 345, 348, 374, 457).

At a follow-up appointment with Dr. Sweeney on February 28, 2008, Plaintiff reported that her symptoms were getting progressively worse, including sporadic sharp pains in her back. Dr. Sweeney instructed Plaintiff to return on

March 6, 2008 to give him a chance to further review her bone scan. (R. 513). At that visit, Dr. Sweeney recommended that Plaintiff consider revision of her spinal fusion surgery. (R. 396, 513). On March 13, 2008, Dr. Payne sent Plaintiff for another series of radiographs of her left knee. The tests were once again essentially negative, showing no fracture or lesions. (R. 643). The next day, Plaintiff was finally able to resume PT on her knee with a goal of strengthening the relevant musculature to decrease gait deficits. (R. 524-26). Shortly thereafter, on March 26, 2008, she filed her claim for disability benefits.

The following month, on April 3, 2008, Plaintiff told Dr. Payne that she did not wish to pursue a second spinal fusion as recommended by Dr. Sweeney. Straight leg raise tests were negative at that time, and she exhibited strength of 5/5 in her leg and hip. Dr. Payne diagnosed Plaintiff with "[d]isk degeneration L5-S1 and low back pain," instructed her to continue with PT, gave her a prescription for Ultram, and suggested that she pursue pain management and possible facet blocks. (R. 626).

When Plaintiff returned to Dr. Payne on April 10, 2008, she complained of occasional but not constant pain. She was taking Lyrica, Ultram, ibuprofen and Flexeril at that time, and Dr. Payne referred her to Rajiv K. Adlaka, M.D., of Pain Control Associates, L.L.C., for pain management. (R. 624). Additional radiographs of Plaintiff's knee taken the same day were all normal. (R. 642). Plaintiff asked Dr. Payne to give her a second opinion on the need for back surgery, so he ordered a CT of her lumbar spine. That April 12, 2008 test revealed postsurgical changes at L5 and S1 and "[m]ild circumferential disc

bulges" at L3-L4 and L4-L5, but "[n]o significant neuroforaminal narrowing or central canal stenosis." (R. 441-42, 620, 688).

On April 16, 2008, Plaintiff started seeing Dr. Adlaka for management of her low back pain. She said that her "constant" pain was aggravated by sitting and relieved by standing, and listed her medications as including Flexeril, Ultram, ibuprofen and Lyrica. (R. 688). Dr. Adlaka noted that Plaintiff's straight leg raise, Gaenslen's, Patrick's and Faber's tests, which test for musculoskeletal abnormalities and hip joint pathology, were all negative, and that she was able to walk within normal limits. Flexion and extension, however, were both moderately painful. (*Id.*). Dr. Adlaka indicated that he would assume responsibility for all of Plaintiff's medication going forward. In that regard, he increased her Ultram dosage, prescribed Klonopin for sleep, and instructed her to discontinue the ibuprofen while staying on the Flexeril and Lyrica. (R. 689).

The next day, on April 17, 2008, Plaintiff went to the St. James Hospital emergency center complaining of lower back pain she described as constant and throbbing. (R. 667, 670). Her pain decreased to a level of 4 or 5 out of 10 in response to Dilaudid, Valium and Vicodin, and she was discharged in stable condition. (R. 667-68). Plaintiff followed up with Dr. Woods on April 21, 2008, receiving prescriptions for clonazepam (a muscle relaxer), Ultram and Motrin. (R. 404). She also had an appointment with Dr. Payne on April 22, 2008, at which time she reported that her pain was "a lot better." Based on the April 12, 2008 CT scan of the lumbar spine, Dr. Payne diagnosed pseudoarthrosis and

back pain, and suggested that Plaintiff work with Dr. Adlaka to see if a spinal cord stimulator or morphine pump might be effective options.  (R. 697).

Plaintiff discussed these alternatives with Dr. Adlaka on April 30, 2008 but decided she wanted to "consider further."  In the meantime, given Plaintiff's report that she "has not seen significant improvement in her pain," Dr. Adlaka increased her Ultram and Klonopin dosages.  (R. 687).

### 3.    May through August 2008

At a two-week follow-up appointment on May 14, 2008, Plaintiff told Dr. Adlaka that the Ultram and Klonopin were not helping her pain and sleep problems.   Dr. Adlaka switched her to Duragesic patches along with hydrocodone (Vicodin) for breakthrough pain.  He also indicated that she would be a good candidate for a transforaminal epidural steroid local anesthetic injection.  (R. 686).

The next day, on May 15, 2008, Virgilio Pilapil, M.D., completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff for the Department of Disability Determination Services ("DDS").  (R. 645-52).  Dr. Pilapil found that Plaintiff can occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand, walk and sit for about 6 hours in an 8-hour workday; and occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. 646, 649).  Her ability to push and/or pull with her lower extremities is limited and she must avoid concentrated exposure to hazards due to "low back pain that radiates down the right leg" and "numbness/tingling of right leg, mostly in right thigh."  (R. 646, 649).  Dr. Pilapil noted that Plaintiff complained of dizziness and

drowsiness associated with her medication, but found her only "partially credible" regarding the severity of her symptoms.  (R. 650).

On May 21, 2008, Dr. Adlaka gave Plaintiff an epidural steroid and local anesthetic injection.  (R. 684).  She was doing well with Duragesic patches at that time, "reporting no side effects."  (R. 685).  By June 11, 2008, the injection had produced a "moderate degree" of pain reduction, but the Duragesic patches were not working well and were causing "some side effects."  (R. 683).  Dr. Adlaka switched Plaintiff to MS Contin (morphine) and indicated that she might be a good candidate for a repeat injection.  (*Id.*).  Plaintiff underwent the second injection on June 25, 2008, and two weeks later, on July 9, 2008, she was doing "much better" and had reduced her use of hydrocodone.  Dr. Adlaka continued Plaintiff on the MS Contin, which provided a "significant reduction in her overall pain," and recommended that she receive intermittent injections along with medication management.  (R. 680).

The next day, on July 10, 2008, Plaintiff went to Dr. Woods seeking a referral for a psychologist, explaining that she was feeling depressed about the need for a second surgical procedure.  (R. 381).  A few days later, on July 15, 2008, she told Dr. Payne that she was still having "a lot of pain" despite the two epidural injections, and felt her symptoms had "continued to get worse."  Dr. Payne scheduled Plaintiff for a discogram, EMG and nerve conduction study for further assessment.  (R. 270, 694).

Plaintiff spoke with Dr. Adlaka about a provocative cervical discography on August 6, 2008, (R. 678), and he performed the procedure on August 13, 2008.

(R. 656-57, 676-77). Plaintiff exhibited "normal controlled disk at L3-L4," but there was "reproduction of her usual low back pain" at L4-L5. (R. 677). A CT scan of the lumbar spine taken the same day showed "[p]ostsurgical changes from posterior fusion and laminectomy at L4-L5 and L5-S1"; "widespread annular tearing of the L4-L5 disk"; and "[m]ild bilateral neural foramen narrowing at the L4-L5 and L5-S1 levels." (R. 269, 674).

Shortly thereafter, on August 18, 2008, Plaintiff's attorney received an undated and unsigned letter from Dr. Woods stating that Plaintiff "remains in significant pain and unable to return to work." (R. 737-38). Dr. Woods diagnosed Plaintiff with L5-S1 fusion failure with intractable back pain, and opined that she: must change positions every 30 minutes with no prolonged sitting, standing or walking; cannot lift more than 5 pounds; and must exercise caution in operating machinery, driving, or performing work requiring concentration "secondary to the pain meds." (R. 738).

### 4.    September through December 2008

When Plaintiff saw Dr. Adlaka again on September 3, 2008, she reported that Dr. Woods had prescribed Effexor for her depression, but she had stopped taking it because it caused a "significant amount of nausea." (R. 672, 760). Dr. Adlaka advised Plaintiff to take an increased dosage of hydrocodone in place of the MS Contin in case that was contributing to the nausea. He also instructed her to discuss possible surgical management with Dr. Payne, which she did the following day. Though Plaintiff was still having a lot of back pain, she told Dr. Payne that she was not mentally prepared to undergo surgery again. He referred

her for continued pain management with Dr. Adlaka, as well as psychological counseling. (R. 692). A radiograph of the lumbar spine taken the same day showed posterior fusion of L5-S1 but was otherwise normal. (R. 701).

On October 15, 2008, Plaintiff informed Dr. Adlaka that her nausea had subsided after stopping Effexor, and she was experiencing "significant improvement in overall pain with MS Contin." At most times, her pain was a level 4 to 5 out of 10. Dr. Adlaka advised Plaintiff to follow-up with Dr. Woods regarding her depression and return to see him in one month. (R. 759).

Later that month, on October 25, 2008, Alan W. Jacobs, Ph.D., performed a Psychological Evaluation of Plaintiff for DDS. (R. 703-05). Plaintiff said that her pain was at a level of 5 out of 10 with medication, causing her most discomfort at night and making it difficult for her to sleep. She explained that she had not scheduled surgery because she was "advised that the outcome . . . would not be statistically in her favor." (R. 703). As for her mental state, Plaintiff described it as "not good," noting that she became depressed "when they told me about my back in January." (R. 704). When she took Effexor, she did not get upset as easily or cry as much, but she stopped taking it two months prior due to side-effects. The worst depression started when she quit working, and at least twice a month she goes to her room and cries. Plaintiff said that she is irritable; her appetite varies with the pain; she occasionally tries to cook; she enjoys occasional visits with her sister; and she spends most of her waking hours reading or working on the computer. (*Id.*). Dr. Jacobs observed that Plaintiff's depression became more apparent as the interview went on, "with eyes

becoming red and wet." (*Id.*).  He diagnosed her with dysthymia and "depressive disorder not otherwise specified (depression associated with chronic pain)."  (R. 705).

On October 30, 2008, Terry Travis, M.D., completed a Psychiatric Review Technique of Plaintiff for DDS.  (R. 706-18).  Dr. Travis found that Plaintiff suffers from dysthymia, (R. 709), which causes moderate limitation in her activities of daily living and ability to maintain concentration, persistence or pace.  (R. 716).  The same day, Dr. Travis completed a Mental RFC Assessment of Plaintiff.  (R. 720-22).  He determined that she is moderately limited in the ability to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and to accept instructions and respond appropriately to criticism.  (R. 720, 721).  She is not significantly limited, however, in the ability to complete a normal workday and workweek, or to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (R. 721).  Dr. Travis concluded that Plaintiff suffers from a "mild affective disorder in response to chronic pain," but she is cognitively intact, she can learn instructions and adapt to circumstances, she can relate appropriately and "function consistently at a reasonable rate within a schedule within her pain limitations," and she is "able to do multistep tasks that can be learned in 1-6 months in a routine work setting within her pain constraints."  (R. 722).

On November 3, 2008, Bharati Jhaveri, M.D., affirmed Dr. Pilapil's May 15, 2008 assessment that Plaintiff is not disabled.  (R. 724-26).  Shortly

thereafter, on November 12, 2008, Plaintiff told Dr. Adlaka that her pain remained mostly at a level of 4 to 5 out of 10, and that the MS Contin was still providing "significant improvement in overall pain" with no reported side effects. (R. 758).

### 5. 2009

Plaintiff continued to treat with Dr. Adlaka and Dr. Woods throughout 2009. At an appointment with Dr. Adlaka on January 7, she reported that she had "excellent function, improved overall daily function, and a reduction in her pain" to a level of 3 out of 10. (R. 757). Plaintiff believed the MS Contin was "very effective for her," though she continued to have trouble sleeping at night. Dr. Adlaka noted that Dr. Woods wanted him to continue managing Plaintiff's medication, and instructed her to start taking Klonopin again and return in a few weeks. (*Id.*). Plaintiff appeared depressed and tired during a visit with Dr. Woods on January 12, 2009, (R. 782), and on February 4, 2009, she told Dr. Adlaka that she still had to use hydrocodone on a daily basis. (R. 756). Nevertheless, her pain level remained at a 3 out of 10 and she was doing "fairly well." Dr. Adlaka prescribed Ambien to help with Plaintiff's ongoing sleep problems and instructed her to schedule a follow-up visit. (*Id.*).

On February 26, 2009, Dr. Woods observed that Plaintiff appeared fatigued. (R. 772). At a visit with Dr. Adlaka on March 4, 2009, Plaintiff reported that she was still having trouble sleeping and had experienced a flare-up of her pain in the previous weeks due to stress at home. Nevertheless, she had cut back on the hydrocodone. Dr. Adlaka instructed Plaintiff to stop taking Ambien

and try Klonopin again, and to continue taking MS Contin and try to avoid using hydrocodone. (R. 754).

When Plaintiff saw Dr. Adlaka again on April 29, 2009, she continued to do "relatively well on her MS Contin" with no reported side effects. Her function remained "good on a daily basis," and Dr. Adlaka recommended that she have an SI joint injection. (R. 753). The following month, on May 27, 2009, Plaintiff was still experiencing "excellent function" with the MS Contin, along with "a significant reduction in her pain over the last several weeks." In light of the improvement she felt in her SI joint, Plaintiff decided not to proceed with an injection at that time. Nevertheless, Plaintiff asked Dr. Adlaka for a letter saying that she is disabled. Dr. Adlaka told her that he "cannot put her at full disability. I would think that she could do light duty but I am not a disability expert, so . . . she should consider seeing a disability doctor if she is looking for some type of full-time disability." (R. 752).

At her next visit with Dr. Adlaka on July 1, 2009, Plaintiff reported a flare of her pain over the previous several weeks, rating it at a level of 6 out of 10. She remained uninterested in "interventional management" so Dr. Adlaka instructed her to continue taking MS Contin and add Limbrel to help with inflammation and pain. (R. 751). Approximately one month later, on July 29, 2009, Dr. Adlaka noted that Plaintiff had experienced improvement in her activities of daily living, and suggested that she consider having a sleep study. (R. 735). Soon thereafter, on August 17, 2009, Plaintiff went to see Dr. Woods after she fell and hurt her back, knee and shoulder. Dr. Woods's treatment notes are difficult to

decipher, but it appears that Plaintiff was not getting relief from the morphine. (R. 770). By August 24, 2009, however, Plaintiff told Dr. Woods that she was feeling "much better" and her back was "not hurting too bad." (R. 769).

On August 26, 2009, Dr. Adlaka observed that Plaintiff was walking with an antalgic gait secondary to leg pain as a result of her recent fall. The treatment note indicates that Dr. Woods had contacted Dr. Adlaka to say that she believed Plaintiff's sleep problems were "mainly related to the pain issues" and did not warrant a sleep study. Dr. Adlaka stated that he would defer to Dr. Woods and "continue to control as best as we can." In that regard, he prescribed Plaintiff Mobic in addition to the MS Contin. (R. 734, 749).

Plaintiff next saw Dr. Adlaka on September 23, 2009, at which time she was responding well to the MS Contin but still having some breakthrough pain. Plaintiff did not report any side effects from the Mobic and said that she thought it was helping to reduce her overall pain. Dr. Adlaka instructed her to continue with both medications. (R. 729, 744). Also on September 23, 2009, Plaintiff had an MRI of the left knee. The test showed "[m]inimal chondromalacia within the left knee" but was "otherwise unremarkable." (R. 739, 768).

On October 15, 2009, Plaintiff returned to Dr. Woods seeking refills of Effexor and Ultram, and complaining of a tremendous amount of stress. She displayed a flat affect at that time, which Dr. Woods described as "unusual." (R. 771). When Plaintiff saw Dr. Adlaka on October 21, 2009, she reported "significant improvement in her overall pain" with the MS Contin and Mobic. Her pain at most times was at a level of 2 out of 10, and she remained unwilling to

consider interventional management options.  (R. 728, 743).  By November 18, 2009, Plaintiff was using Mobic "only on [an] as needed basis."  The MS Contin continued to be very effective, keeping her pain at about a level of 3 out of 10, and she "ha[d] been showing increased activity level with the medication."  (R. 742).  The last treatment note from Dr. Adlaka is dated December 9, 2009, and states that Plaintiff's pain had increased slightly to a level of 5 out of 10, likely due to the weather.  He instructed her to continue taking Mobic and MS Contin, and gave her a home exercise program.  (R. 741).

### 6. 2010

On January 11, 2010, Plaintiff went to Dr. Woods for a general physical examination.  (R. 767).  The notes are difficult to read, but it appears that Plaintiff said she "feels better."  She also indicated that she was upset about her pain doctor, likely referring to the fact that her insurance would no longer cover visits with Dr. Adlaka.  (R. 42, 767).  Another undated note from around that time (possibly January 27, 2010) states that Plaintiff was struggling with insomnia and wanted an increase in her pain medications.  It does not appear that Dr. Woods agreed to the increase at that time.  (R. 766).

### B. Plaintiff's Testimony

In an April 2008 Function Report completed in connection with her application for disability benefits, Plaintiff stated that she spends most of the day in bed reading, watching television and talking on the phone, though she is able to shower and dress herself.  (R. 234, 238).  She can use the microwave to prepare soups and "TV dinners" 2 or 3 times per week, and she can wash

dishes, clean, and do laundry as long as her son carries the clothes for her. (R. 236). Plaintiff stated that she is able to walk and drive a car, and gets out of the house about 4 or 5 times per month for doctor appointments and PT. She shops for food once a month, using a motorized scooter if it takes longer than 30 minutes, but she cannot carry any heavy items. (R. 237). The pain in her back makes her unable to lift more than 5 pounds, sit for more than an hour, or bend, stand, reach and walk for more than 10 to 15 minutes. (R. 239). In addition, her medications make her dizzy and sleepy, which affects her concentration. (R. 240, 241).

Plaintiff completed a second Function Report and Physical Impairments Questionnaire on October 4, 2008. (R. 258-68). She reiterated that she spends most of the day in bed reading and watching television due to pain and drowsiness from her medication. (R. 258, 262). She has trouble sleeping, but can still make TV dinners and sandwiches 2 or 3 times per week, dust, clean the bathroom and wash a few dishes. (R. 259, 260). Plaintiff stated that she goes outside once or twice per week, including shopping for food once a month and going to the doctor twice a month. She also calls her sisters and checks email twice per week. (R. 262). Her lifting ability remains at 5 pounds, and she can walk for about 30 minutes before needing to rest for 15 minutes. (R. 263). Plaintiff would like to return to work, but she cannot concentrate for more than 30 minutes at a time. (R. 263, 265).

At the February 19, 2010 hearing before the ALJ, Plaintiff testified that she stopped working for the IRS in August 2007 after she fractured her left femur,

which in turn "threw off [her] back." (R. 41). Most of her pain is in the lower back and radiates down the left leg, and her doctors told her she needs a second fusion surgery. (R. 42-44). Plaintiff said the pain varies throughout the day, starting as an aching in the morning and becoming more of a stabbing sensation if she walks or drives too far, meaning more than 15 or 30 minutes. (R. 45). Her pain medication makes her very drowsy and affects her ability to focus, but she also has trouble sleeping due to back discomfort. (R. 47, 49). The most comfortable position is lying down with a pillow between her legs, and she spends at least 60 to 70% of the day in bed. (R. 49, 55).

With respect to activities, Plaintiff testified that she can only sit for 15 to 30 minutes before needing to get up due to pain, and she tries not to lift more than 5 or 10 pounds. (R. 46). Around the house, she tries to "do little things" like straightening up the bed, vacuuming hard floor surfaces, washing dishes and doing laundry. (*Id.*). She also watches television and reads, but finds it hard to concentrate sometimes. (R. 50). Plaintiff stated that she can access the internet from her cell phone for 15 to 30 minutes at a time, and she shops for groceries as long as someone goes with her. (*Id.*).

In addition to her physical pain, Plaintiff also suffers from depression. She has crying spells two or three times per week, "space[s] out," and becomes irritable, even when taking Effexor. She does not, however, receive any therapy or related counseling. (R. 51-52).

## C. Testimony of Shanice Brown

Plaintiff's daughter, Shanice Brown, accompanied Plaintiff to the hearing and testified on her behalf. Ms. Brown confirmed that her mother has constant pain and cannot sit or stand for more than 5 or 10 minutes. (R. 60). Her medication makes her groggy and she spends a lot of time in bed, generally unable to function on a daily basis. As a result, Ms. Brown said, she has to do "[p]retty much everything" for her mother. (R. 60-61, 63). Ms. Brown also testified that Plaintiff is depressed about her inability to be more active in the family, noting that "there's a lot of things she can't do." (R. 61-63).

## D. Vocational Expert's Testimony

Mr. Grzesik testified at the hearing as a VE. The audio recording was turned off shortly after the testimony began, cutting off both the ALJ's hypothetical questions to the VE and the VE's answers. (R. 66). Based on testimony later in the proceeding, it appears that the first hypothetical question involved a person who can: occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl; learn instructions, relate appropriately and adapt to circumstances; "function consistently at a reasonable rate within a schedule, within her pain limitations"; and "do multi-step tasks that can be learned in one to six months in a routine work setting"; but who can never climb ladders, ropes or scaffolds; and must avoid concentrated exposure to hazards. (R. 70). A second hypothetical applied the same limitations to a person who can only perform sedentary, as opposed to light work. (R. 71-72).

When the recording resumed, the ALJ was asking about a third "hypothetical that [Plaintiff's] treating physician gave." (*Id.*). From the context, it appears that the ALJ was referring to Dr. Woods's 2008 opinion that Plaintiff must change positions every 30 minutes with no prolonged sitting, standing or walking; cannot lift more than 5 pounds; and must exercise caution in operating machinery, driving, or performing work requiring concentration "secondary to the pain meds." (R. 67, 738). The VE stated that a person with those limitations could perform "the same sedentary jobs" that he identified for the first hypothetical involving work at a light exertion level, including order clerk, information clerk and callout operator. (R. 66, 68).

In response to questioning from Plaintiff's attorney, the VE testified that no jobs would be available to a person who has to walk away from her work station for up to 30 minutes at a time. (R. 72, 73). Nor can an individual remain employed if she has to take breaks that keep her off-task for more than 10% of the workday. (R. 76-77).

## E.    Administrative Law Judge's Decision

The ALJ found that Plaintiff's degenerative disc disease of the lumbar spine and depression are severe impairments, but that they do not meet or equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21-22). After discussing the medical and testimonial evidence in detail, the ALJ determined that Plaintiff has the capacity to perform light work with the following restrictions: she can only occasionally climb ramps and stairs; she can never climb ladders, ropes or scaffolds; she can occasionally balance, stoop, kneel,

crouch and crawl; she must avoid concentrated exposure to hazards; she can learn instructions, adapt to circumstances, and relate appropriately; she can "function consistently at a reasonable rate within a schedule within her pain limitations"; and she can "do multi-step tasks that can be learned in 1-6 months in a routine work setting within her pain constraints."  (R. 22).

In reaching this conclusion, the ALJ noted that Plaintiff has received "essentially routine and/or conservative" treatment for her back pain, which "has been generally successful in controlling [her] symptoms."  (R. 26).  In that regard, the ALJ found it significant that Plaintiff engages in a variety of activities of daily living, including personal grooming, light cooking, simple cleaning, light vacuuming, washing dishes, watching TV, grocery shopping, reading, and using the internet.  (R. 27).  As for Plaintiff's depression, the ALJ emphasized that she never sought or received treatment from a mental specialist, and that "all treatment has been rendered by a general practitioner."  (R. 26).  Though Ms. Brown generally corroborated her mother's testimony regarding pain and depression, the ALJ concluded that their close relationship "cannot be entirely ignored in deciding how much weight it deserves."  (R. 27).

With respect to the opinion evidence, the ALJ acknowledged Dr. Woods's 2008 letter requiring Plaintiff to change positions every 30 minutes, lift no more than 5 pounds, and exercise caution in operating machinery, driving or doing work requiring concentration "secondary to pain medications."  (R. 27).  The ALJ declined to give the opinion controlling weight, however, because Dr. Woods is a general practitioner who did not treat Plaintiff's knee and back, and who "just

recently started managing her medication." (*Id.*). In the ALJ's view, "the doctor's own reports fail to reveal the type of significant clinical and laboratory abnormalities one would expect if [Plaintiff] were as limited as the doctor has opined." (*Id.*). Moreover, Dr. Adlaka's treatment notes reflect that Plaintiff was obtaining good relief from her pain medication and could do light work. (*Id.*). Plaintiff testified at the hearing that she suffers various side effects from those medications, but the ALJ concluded that the treatment notes "do not corroborate those allegations." (*Id.*).

Based on the stated RFC, the ALJ accepted the VE's testimony that Plaintiff remains capable of performing a significant number of unskilled light or sedentary jobs available in the national economy, including sales attendant (32,000 jobs available), cashier (40,000 jobs available), officer helper (12,000 jobs available), call out operator (8,000 jobs available), information clerk (7,500 jobs available), and order clerk (1,000 jobs available). (R. 28-29). The ALJ thus concluded that Plaintiff is not disabled within the meaning of the Social Security Act, and is not entitled to benefits.

## DISCUSSION

### A.     Standard of Review

Judicial review of the Commissioner's final decision is authorized by Section 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the Court may not engage in its own analysis of whether Plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it

"displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). The court's task is to determine whether the ALJ's decision is supported by substantial evidence, which is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (quoting *Skinner*, 478 F.3d at 841).

In making this determination, the court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled." *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)). Where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## B.     Five-Step Inquiry

To recover DIB or SSI under Titles II and XVI of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act.[3] *Keener v. Astrue*, No. 06-CV-0928-MJR, 2008 WL 687132, at *1 (S.D. Ill. Mar. 10, 2008). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental

---

[3]     The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 *et seq.*, and are virtually identical to the SSI regulations set forth at 20 C.F.R. § 416.901 *et seq.*

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Crawford v. Astrue*, 633 F. Supp. 2d 618, 630 (N.D. Ill. 2009). In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

## C.    Analysis

Plaintiff identifies several errors supporting her request for a remand, arguing that the ALJ: (1) failed to properly accommodate her moderate limitation in concentration, persistence or pace; (2) erred in weighing the opinion of her treating physician; (3) made a flawed credibility assessment; (4) improperly discounted her stated need to lie down during the day; (5) failed to properly consider the testimony of her daughter; and (6) wrongly ignored the fact that she was found disabled by another government agency.

### 1.    Limitation in Concentration, Persistence or Pace

Plaintiff first objects that the ALJ's RFC does not properly account for her moderate limitations in concentration, persistence or pace. (Doc. 18, at 6; Doc. 24, at 1-2). At step three of the analysis, the ALJ found Plaintiff "able to function consistently at a reasonable rate within a schedule within her pain limitations;

and . . . able to do multi-step tasks that can be learned in 1-6 months in a routine work setting within her pain constraints." (R. 22). Plaintiff characterizes this as essentially a limitation to simple, unskilled work, noting that at step 5 of the analysis, the ALJ accepted the VE's testimony that she is capable of performing a variety of unskilled jobs. (Doc. 18, at 6). Plaintiff then argues for remand based on the Seventh Circuit's repeated admonition that a limitation to unskilled work is insufficient to account for mental deficiencies. *Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Masood v. Astrue*, No. 11 C 7551, 2013 WL 1093098, at *3 (N.D. Ill. Mar. 15, 2013).

The flaw in Plaintiff's argument is that the ALJ's language is taken directly from Dr. Travis's October 30, 2008 mental RFC assessment. Dr. Travis found Plaintiff moderately limited in the ability to "maintain attention and concentration for extended periods," and to "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (R. 720). He then concluded that despite these limitations, Plaintiff can "function consistently at a reasonable rate within a schedule" and "do multistep tasks that can be learned in 1-6 months in a routine work setting." (R. 722). Where, as here, "a medical expert 'translated an opinion of the claimant's medical limitations into an RFC assessment' an ALJ may rely upon that translation." *Adams v. Astrue*, 880 F. Supp. 2d 895, 912 (N.D. Ill. 2012) (quoting *Milliken v. Astrue*, 397 Fed. Appx. 218, 221-22 (7th Cir. 2010)). *See also Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002) (no error where physician translated moderate mental limitations

into a specific RFC assessment that the plaintiff could still perform low-stress, repetitive work).

Plaintiff argues that Dr. Travis's RFC is of no help to Defendant in this case because the ALJ "did not state that she was adopting" it. (Doc. 24, at 1). Given that the ALJ quoted the RFC word-for-word, however, it is clear that she both adopted that opinion and gave it full weight. Indeed, Plaintiff points to no contrary RFC in the record. The ALJ's RFC determination sufficiently accounts for Plaintiff's moderate limitations in concentration, persistence, or pace as set forth by Dr. Travis, and Plaintiff's request for remand on this basis is denied.

### 2. Weight of Treating Physician Testimony

Plaintiff next challenges the ALJ's decision to reject Dr. Woods's August 2008 opinion that she is disabled. A treating source opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); *see Scott v. Astru*e, 647 F.3d 734, 739 (7th Cir. 2011); *Campbell v. Astru*e, 627 F.3d 299, 306 (7th Cir. 2010). An ALJ must offer "good reasons" for discounting a treating physician's opinion, *Scott*, 647 F.3d at 739, and then determine what weight to give it considering (1) the length of the treatment relationship and frequency of examination, (2) the nature and extent of the treatment relationship, (3) the degree to which the opinion is supported by medical signs and laboratory findings, (4) the consistency of the opinion with the record as a whole, and (5)

whether the opinion was from a specialist. 20 C.F.R. § 404.1527(c)(2)-(5). *See, e.g.*, *Simila*, 573 F.3d at 515.

Dr. Woods opined in or around August 2008 that Plaintiff "remains in significant pain and is unable to return to work." (R. 738). She further stated that Plaintiff must change positions every 30 minutes with no prolonged standing, sitting or walking; cannot lift more than 5 pounds; and must exercise caution in operating machinery, driving, or performing work requiring concentration "secondary to pain meds." (*Id.*). As the ALJ fairly noted, Dr. Woods failed to identify any clinical or laboratory findings indicative of such limitations.[4] (R. 27). The only test she mentioned is the July 2007 MRI relating to Plaintiff's knee, (R. 737), and her treatment notes do not reflect that she performed any other examinations or evaluations, though Plaintiff certainly complained of knee and back pain on numerous occasions.

Plaintiff insists that Dr. Woods did evaluate her functioning, directing the Court to a December 2007 note stating that Plaintiff was moving with great difficulty, exhibited an antalgic gait with tenderness in the lower back, and had "radiculopathy." (Doc. 18, at 13 (citing R. 402); Doc. 24, at 7 (citing R. 402)). As a preliminary matter, the purported radiculopathy diagnosis appears nowhere else in the record, and there is no indication as to how Dr. Woods, a primary care physician, formulated this opinion. Significantly, Plaintiff's April 2008 straight leg raise tests were all negative, and her MRI tests and CT scans all showed either

---

[4]     The ALJ did agree that Plaintiff must exercise caution around hazards, a finding confirmed by Dr. Pilapil. (R. 22, 646).

no or mild neuroforaminal narrowing, with no other evidence of nerve root compression. *See Benford v. Astrue*, No. 11 C 4, 2011 WL 4396921, at *4 n.4 (N.D. Ill. Sept. 20, 2011) ("Lumbar radiculopathy is typically caused by a compression of the spinal nerve root.").

In any event, Plaintiff's reliance on records from December 2007 ignores the ALJ's discussion of more recent treatment notes from Dr. Adlaka, the pain specialist. Throughout 2009, Dr. Adlaka found that Plaintiff's pain level was generally rated at a level of 3 out of 10 with medication. (R. 25, 27, 728, 752, 753, 756, 757, ). And on May 27, 2009, he told Plaintiff that he "cannot put her at full disability" because "I would think she could do light duty." (R. 27, 752). Plaintiff characterizes this statement as "cursory, unsupported, and indefinitive [sic]," (Doc. 18, at 14), but it is entirely consistent with Dr. Adlaka's treatment notes from that time period, as well as Dr. Pilapil's May 2008 assessment that Plaintiff has the RFC to perform light work, which was affirmed by Dr. Jhaveri in November 2008. (R. 646, 724-26). Plaintiff's only response to this evidence is a claim that the ALJ should have noted that Dr. Jacobs (the consulting psychologist) agreed with Dr. Woods's assessment that Plaintiff needs to change positions. (Doc. 18, at 14; Doc. 24, at 8). A review of Dr. Jacobs's notes, however, reflects that he merely observed Plaintiff changing positions during the course of his one-time examination in October 2008. (R. 704). Dr. Jacobs did not "agree" that Plaintiff must change positions for medical reasons.

Plaintiff also claims that the ALJ should have re-contacted Dr. Woods "to determine the basis for her opinion, rather than simply rejecting it." (Doc. 18, at

14).  "An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled.'"  *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citing 20 C.F.R. § 404.1512(e)).  Here, the ALJ had all of Dr. Woods's treatment notes, the results of Plaintiff's diagnostic tests, and the reports from other treating and consulting physicians, including Dr. Adlaka, Dr. Pilapil, Dr. Payne, and Dr. Sweeney.  In other words, "[t]his was not a case in which the basis of the medical opinions required explication."  *Masek v. Astrue*, No. 08 C 1277, 2010 WL 1050293, at *17 (N.D. Ill. Mar. 22, 2010).  The ALJ reasonably concluded that Dr. Woods's opinion was not supported by the record evidence, and did not err in failing to re-contact her for further information.

For all these reasons, Plaintiff's request for remand based on the ALJ's decision to reject Dr. Woods's August 2008 opinion is denied.

### 3.    Credibility Assessment and Need to Lie Down

Plaintiff next claims that the ALJ made several errors regarding her credibility, including her stated need to lie down.  In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence.  *See* SSR 96-7p, at *2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007).  If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case

record." *Arnold*, 473 F.3d at 822. *See also* 20 C.F.R. § 404.1529; *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004). Because hearing officers are in the best position to evaluate a witness's credibility, their assessment should be reversed only if "patently wrong." *Castile*, 617 F.3d at 929; *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008).

As a preliminary matter, the Court notes that the ALJ included the following language in her credibility analysis: "After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [stated] residual functional capacity assessment." (R. 26). The Seventh Circuit has repeatedly criticized this template as "unhelpful" and "meaningless boilerplate," but ALJs continue to use it in their decisions. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Each time they do so, plaintiffs and their counsel seize on the language as evidence that the credibility finding is backwards and defective. *See Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012) (the template "implies that ability to work is determined first and is then used to determine the claimant's credibility. That gets things backwards.").

The Court agrees that the "hackneyed language seen universally in ALJ decisions adds nothing" to a credibility analysis. *Shauger*, 675 F.3d at 696. Where, as here, however, the ALJ provides a detailed discussion of the plaintiff's symptoms and testimony, and the reasons she did not find the plaintiff's

statements fully credible, the use of the boilerplate template does not alone provide a basis for remand. *See, e.g., Richison v. Astrue*, 462 Fed. App. 622, 625 (7th Cir. 2012) (the boilerplate language is "inadequate, by itself, to support a credibility finding," but decision affirmed where "the ALJ said more."). Plaintiff's argument to that effect is rejected.

Turning to the ALJ's substantive analysis, she first observed that Plaintiff's complaints of disabling pain and limitations "are not substantiated by the objective medical . . . evidence." (R. 27). Plaintiff's most recent back problems began after she fractured her left femur in June 2007, which affected her gait. A December 12, 2007 radiogram showed changes at L5-S1 relating to her 2002 laminectomy, and "mild diffuse osteopenia." (R. 23, 455). Despite starting physical therapy and taking Norco, Vicodin and Motrin, Plaintiff was admitted to the hospital on January 31, 2008 with intractable back pain. (R. 23, 505). A February 1, 2008 MRI of the lumbar spine again showed postoperative changes from the prior surgery at L5-S1, including disc space narrowing and disc desiccation. However, there was no significant disc bulge, herniation, stenosis or neuroforaminal narrowing. (R. 23, 356). An April 12, 2008 CT scan of the lumbar spine likewise showed postsurgical changes at L5 and S1 and mild circumferential bulges at L3-L4 and L4-L5, but no significant neuroforaminal narrowing or central canal stenosis. (R. 24, 441-42).

On May 15, 2008, Dr. Pilapil found Plaintiff capable of standing, walking and sitting for about 6 hours in an 8-hour workday; occasionally climbing ramps and stairs; and occasionally balancing, stooping, kneeling, crouching and

crawling. (R. 24, 646, 649). An August 2008 CT scan showed widespread annular tearing at L4-L5, but confirmed the presence of only mild bilateral neural foramen narrowing at L4-L5 and L5-S1. (R. 269). In October 2008, Plaintiff told Dr. Adlaka that she was experiencing "significant improvement in overall pain with MS Contin." (R. 24, 759). Indeed, throughout January and February 2009, Plaintiff's pain was at a level of 3 out of 10, and she continued to do "relatively well" in April. By May 27, 2009, she showed "excellent function" and a "significant reduction in her pain." (R. 24-25, 756-57). Plaintiff experienced a setback in August 2009 following a fall, but by October 21, 2009 her pain was mostly at a level of 2 out of 10. (R. 25, 728). She had another flare in December 2009, taking her pain to a level of 5, but Dr. Adlaka determined that it was likely due to the weather. (R. 25, 741).

Plaintiff objects to the ALJ's alleged "focus on objective medical evidence," noting that "an ALJ cannot disregard subjective complaints of disabling pain just because a determinable basis for pain of that intensity does not stand out in the medical record." (Doc. 18, at 8) (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009)). This argument is unavailing because the ALJ went on to consider other factors that affect credibility as required by 20 C.F.R. § 404.1529. The ALJ stated, for example, that the treatment Plaintiff has received "not only has been essentially routine and/or conservative in nature, but it has been generally successful in controlling [her] symptoms." (R. 26). Plaintiff claims that "[t]his statement is wholly unsupported by the record," (Doc. 18, at 10), but Dr. Adlaka recorded her pain at a level of 2 or 3 out of 10 throughout much of 2009, and

regularly noted that she obtained significant relief from MS Contin.  *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002) (plaintiff's estimate that "his pain reaches a level of 3 on a scale of 0 to 10 . . . does not sound disabling.").

The ALJ also found that Plaintiff's activities of daily living "are not limited to the extent one would expect" given her complaints of disabling pain.  (R. 27).  In that regard, Plaintiff remains capable of engaging in personal grooming, light cooking, simple cleaning (such as light vacuuming, washing dishes, and a little laundry if her son carries the loads up and down the stairs), and grocery shopping.  She also watches TV, reads magazines, and uses the internet on her cell phone for 15-20 minutes.  (*Id*.).  Plaintiff argues that this discussion constitutes reversible error because "the Seventh Circuit has roundly condemned ALJs relying on activities as militating against a claim of disability."  (Doc. 18, at 9).  This is not entirely accurate.  The Seventh Circuit has made it clear that "it is appropriate for an ALJ to consider a claimant's daily activities when evaluating their credibility, SSR 96-7p, at *3."  *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013).  This "must be done with care," however, because "a person's ability to perform daily activities, especially if th[ey] can be done only with significant limitations, does not necessarily translate into an ability to work full-time."  *Id*.

Contrary to Plaintiff's suggestion, the ALJ did not simply conclude that her activities of daily living translate into an ability to engage in full-time employment.  Rather, the ALJ cited this as one of several factors that undermined Plaintiff's claim of disabling pain.  In that regard, Dr. Adlaka not only stated that Plaintiff's pain was at a level of 2 or 3 out of 10 throughout most of 2009, but he also

repeatedly observed that she exhibited "excellent function," improvement in activities of daily living, and "increased activity level." (R. 25, 27, 728, 735, 752, 753). And he expressly opined that Plaintiff is capable of light work, an opinion confirmed by Dr. Pilapil. (R. 752). On this record, the ALJ did not err in concluding that Plaintiff's description of her daily activities provides further evidence that she is not as limited as she claims. These facts distinguish this case from *Roddy*, where the ALJ completely ignored a treating physician's opinion that the plaintiff could not work,[5] "misunderstood or mischaracterized the results of [an] MRI," and then concluded that the plaintiff's complaints were not credible because she "was able to remain self-sufficient and complete household chores, albeit by taking longer to do so." 671 F.3d at 636, 637, 639.

Trying another approach, Plaintiff argues that the ALJ "failed to properly take into account the limitations on [her] activities," noting that she "would lie down to lessen her pain exacerbations after activities and needed to take breaks." (Doc. 18, at 10; Doc. 24, at 5). The ALJ expressly considered Plaintiff's stated need to lie down for 60 to 70% of the day, (R. 26), but clearly did not accept this testimony as credible.[6] *Cf. Shauger*, 675 F.3d at 697 (ALJ erred in completely ignoring the plaintiff's testimony that he dealt with pain by lying down). The ALJ could have done a better job of explaining this decision, but she did

---

[5]     As noted, the ALJ here acknowledged Dr. Woods's opinion that Plaintiff is unable to work, but reasonably rejected it on the grounds that it is not supported by objective medical evidence and is contradicted by subsequent treatment notes from Plaintiff's pain specialist.

[6]     If the ALJ had credited the testimony, she also would have had to find Plaintiff disabled. *See Bjornson*, 671 F.3d at 646 ("One does sedentary work sitting . . . but not lying down.").

thoroughly address the medical record, which reveals that none of Plaintiff's doctors ever indicated that she needs to lie down on a regular basis, much less for most of the day. Nor do the treatment notes reflect that Plaintiff told her physicians that she was spending so much time in bed. *Compare Bjornson*, 671 F.3d at 647 (plaintiff's assertion that she must lie down to alleviate pain was supported by her pain specialist, who stated that she "must sit or lie down several times per day to control pain."). Viewed together with Dr. Adalaka's opinion that Plaintiff's pain is well controlled with medication and she can perform light work, the ALJ's decision to reject Plaintiff's stated need to lie down all day is not patently wrong.

Plaintiff argues that the ALJ still erred in discounting her testimony that the pain medications make her drowsy, which could affect her ability to work. (R. 26, 27). In support of this position, Plaintiff cites *Terry v. Astrue*, 580 F.3d 471 (7th Cir. 2009), where the court observed that "some patients may not complain because the benefits of a particular drug outweigh its side effects." *Id.* at 477. The problem for Plaintiff is that she did report "some side effects" relating to the Duragesic patches, (R. 683), as well as nausea from Effexor, (R. 672), but she never mentioned dizziness or drowsiness. Moreover, the treatment notes reflect that on multiple occasions she "report[ed] no side effects from the medication" at all. (R. 729, 753, 758, 759).

In sum, the ALJ reasonably concluded that Plaintiff's complaints of disabling pain and limitations are not supported by the objective medical tests or

the findings of her pain specialist.  This credibility determination is not patently wrong and will not be reversed here.

### 4.	Testimony of Shanice Brown

Plaintiff's next argument for remand – that the ALJ improperly weighed testimony from her daughter, Shanice Brown – fares no better.  The regulations provide that in evaluating opinions from non-acceptable medical sources such as family members, ALJs are to "apply the same criteria listed in [20 C.F.R.] § 404.1527([c])(2)."  *Phillips v. Astrue*, 413 Fed. Appx. 878, 884 (7th Cir. 2010).  Relevant factors include "the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence."  *See* SSR 06-03p, at *6.

The ALJ discussed Ms. Brown's testimony that she has to do everything for her mother, who experiences a lot of pain and "sleeps all the time."  (R. 26).  The ALJ also acknowledged Ms. Brown's statement that Plaintiff "was unable to function on a regular basis and . . . has been depressed because she is unable to do a lot of things with her family."  (*Id.*).  Later in the decision, the ALJ confirmed that Ms. Brown's testimony "was generally corroborative of [Plaintiff's] allegations, and has been duly considered," but observed that "the close relationship between the witness and [Plaintiff] and the possibility that the testimony was influenced in favor of [Plaintiff] by a desire to help [her] cannot be entirely ignored in deciding how much weight it deserves."  (R. 27).

Plaintiff argues that the ALJ should have more clearly articulated the specific weight she afforded Ms. Brown's testimony, and that her failure to do so

constitutes reversible error. (Doc. 18, at 15-16; Doc. 24, at 9-10). The Court disagrees. Given that the ALJ found Plaintiff not disabled, it is evident that she declined to give Ms. Brown's testimony full weight. This is not surprising since Ms. Brown's testimony essentially mirrored her mother's allegations that she spends most of the day in bed, she feels sleepy and depressed, and she needs her family to help her do things. (R. 27, 46, 47, 49, 55). As discussed earlier, the ALJ reasonably discounted Plaintiff's statements in that regard, and her failure to assign a specific weight to Ms. Brown's largely redundant testimony does not require a reversal in this case. *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (ALJ was not required even to discuss wife's testimony that "essentially corroborated [the plaintiff's] account of his pain and daily activities" and thus "was essentially redundant.").

### 5. Disability Finding from Another Government Agency

Plaintiff finally argues that the ALJ committed reversible error by failing to mention the fact that she was found disabled by the Federal Employees Retirement System ("FERS") in January 2009. (R. 324-26). Plaintiff concedes that pursuant to 20 C.F.R. § 404.1504, the FERS decision is not binding in this case. *See Allord v. Barnhart*, 455 F.3d 818, 820 (7th Cir. 2006) ("Determinations of disability by other agencies do not bind the Social Security Administration."). She claims, however, that the ALJ was not free to ignore this "significant evidence" because "the Agency's own policy mandates that it be considered and weighed." (Doc. 18, at 18) (citing SSR 06-3p).

There is no dispute that the ALJ's decision says nothing about the FERS disability finding. This omission was arguably improper since "even though the ALJ is not bound by the disability determinations of other government agencies, the ALJ should explain the consideration given to those decisions in her opinion." *Dykes v. Astrue*, No. 1:12-CV-00370-MJD-RLY, 2013 WL 125164, at *7 (S.D. Ind. Jan. 8, 2013). *But see Clifford*, 227 F.3d at 874 ("[T]he ALJ is not required to (but may) consider the disability finding of other agencies."). Regardless, the Court agrees with Defendant that any such error was harmless in this case. *See Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) ("[T]he doctrine of harmless error . . . is fully applicable to judicial review of administrative decisions."); *Scott v. Astrue*, 730 F. Supp. 2d 918, 935 (C.D. Ill. 2010) ("Harmless errors are those that do not affect the ALJ's determination that a claimant is not entitled to benefits.").

To qualify for disability benefits under FERS, a person "must have become disabled, . . . because of a disease or injury, for useful and efficient service in your *current position*," and "[y]our agency must certify that it . . . has considered you for any vacant position *in the same agency at the same grade/pay level, within the same commuting area*, for which you are qualified for reassignment." (http://www.opm.gov/retirement-services/fers-information/eligibility/, last viewed on April 15, 2013) (emphasis added). The IRS determined that Plaintiff meets that definition because she is incapable of performing her work as a tax examiner, and her condition "precludes reassignment to another position" in the

agency "at the same grade or pay level in the same commuting area."  (R. 331, 332).

The definition of disability under the Social Security Act is much more restrictive, requiring that an individual be unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment . . . ."  42 U.S.C. § 423(d)(1)(A).  In other words, an ALJ must look beyond a claimant's ability to perform a past or comparable job (the standard under FERS) and additionally consider her ability to perform any other jobs available in the regional economy.  20 C.F.R. § 404.1520(g) ("Your impairment(s) must prevent you from making an adjustment to *any other work*.") (emphasis added).  Here, the ALJ expressly agreed that Plaintiff is unable to perform her past relevant work as a tax examiner with the IRS.  (R. 27-28).  The ALJ then accepted the VE's testimony that Plaintiff is nonetheless capable of working in a variety of other positions, including sales attendant, cashier, office helper, call out operator, information clerk and order clerk.  (R. 28-29).  On the record presented, the ALJ's failure to mention the FERS disability finding is at most a harmless error and does not support a remand in this case.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 17) is denied and the Commissioner's Motion for Summary Judgment (Doc. 22) is granted.  The Clerk is directed to enter judgment in favor of Defendant.

ENTER:

Dated:  April 30, 2013

SHEILA FINNEGAN
United States Magistrate Judge